**Neda NEWNAM**

v.

**REMEDIAL EDUCATION AND DIAGNOSTIC SERVICES, INC.**

Civ. A. No. 79–2304.

United States District Court,
E. D. Pennsylvania.

July 31, 1981.

Andrew Napoli, Philadelphia, Pa., for plaintiff.

David L. Marshall, Norristown, Pa., for defendant.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

This is a civil action in which plaintiff Neda Newnam contends that defendant violated the terms of its employment contract with her by failing to give her all of the bonus to which she was entitled under the terms of the contract. The case was tried to the court without a jury on June 22–23, 1981, after which the parties submitted proposed findings of fact and conclusions of law. On the basis of the pleadings, testimony, exhibits, and submissions of the parties, I make the following

### I. FINDINGS OF FACT

1. Plaintiff Neda Newnam is a citizen and resident of New Jersey. She has experience in the delivery of educational services.

2. Defendant Remedial Education and Diagnostic Services, Inc. (READS), is a Pennsylvania corporation incorporated in 1975 for the purpose of delivering remedial educational services to non-public schools under Act 89 of the 1975 Session of the Pennsylvania General Assembly, which provided public funding for such services.

3. At the times material herein, the sole shareholder of READS was A/V Educational Products Co., Inc. (A/V), which dealt in educational materials and teaching aids. The sole shareholder of A/V was George Stricker, who was also the president of READS since its incorporation.

4. At the times material herein, A/V was an 80% shareholder in Croft Company, which also dealt in educational products. Stricker was also an 80% shareholder in Walsh & Co., which dealt in educational products.

5. For all practical purposes, George Stricker controlled the business affairs of READS, A/V, Croft, and Walsh.

6. On August 30, 1976, Neda Newnam and READS entered into a written employment agreement under which Newnam was to serve as a project co-ordinator.

7. The agreement provided for a salary for Newnam's services plus a bonus of 10% of the net profit of READS based on "institutional overhead" as that term is defined by Act 89.

8. In effect, institutional overhead was the profit factor which READS was permitted to charge the local school districts with which it contracted to provide services.

9. The agreement provided for Newnam's services from August 30, 1976 to June 30, 1978 and specified further that, in the event that READS chose not to renew Newnam's services beyond June 30, 1978, she was nevertheless entitled to the 10% bonus on net profits on READS' contracts through June 30, 1979.

10. In February, 1978, READS relieved Newnam of her duties, but continued to pay her salary until the end of June 1978. READS also notified Newnam by letter of its intention not to renew the contract for her services beyond June 1978. In the letter containing the notice of termination, George Stricker re-affirmed READS' contractual obligation to pay Newnam the 10% bonus for the period July 1, 1978 through June 30, 1979.

11. During the period of her employment, there were disagreements and conflicts between Newnam and officials of READS, but I find by a preponderance of the evidence that Newnam's conduct did not in any way constitute a breach of her employment agreement with READS.

12. Newnam's written agreement with READS spanned three fiscal years:

July 1, 1976—June 30, 1977
July 1, 1977—June 30, 1978
July 1, 1978—June 30, 1979.

13. During each of the three years, READS contracted with intermediate units of three school districts: the Philadelphia, Bucks, and Montgomery County districts.

14. In the contracts with the Bucks and Montgomery units, READS set forth costs for its services, which READS was not permitted to exceed, and a line item for institutional overhead, which was a profit to READS.

15. The initial contract submitted by READS to the Philadelphia unit followed the same format, including an item of $15,-752 for institutional overhead, but was returned to READS because a local regulation prohibited the district from entering into a contract providing for a profit to the service supplier. READS then submitted a contract for services on a cost-only basis.

16. In re-submitting the Philadelphia contract on a cost-only basis, READS created a billing for educational materials from A/V which in effect secured for READS the same amount, $15,752, which had been disallowed as institutional overhead.

17. In each of the fiscal years from July 1, 1976, to June 30, 1979, READS generated a net profit on its contracts with the Bucks and Montgomery units. In each of those fiscal years it suffered a loss on the contracts with the Philadelphia unit.

18. Although READS did not profit from the Philadelphia contracts, the other Stricker-controlled companies which supplied materials and equipment to READS for use in discharging the Philadelphia contracts did earn a profit as a result of them.

19. In addition to its service contract with the Philadelphia unit, READS entered into a separate equipment contract with the Philadelphia School District on May 24, 1976, to supply a substantial amount of equipment such as vehicles, trailers, and furnishings.

20. Although the equipment contract was in the name of READS, it was substantially performed by A/V, which had the capital and experience to supply the equipment. READS made no profit from the equipment contract.

21. The equipment contract between READS and the Philadelphia unit was not a service contract of the kind which Newnam was involved in administering, and I find that the parties did not intend the employment contract between Newnam and READS to encompass a supplemental equipment contract of this kind.

22. READS accepted the Philadelphia service contracts, even though it suffered a loss on them, because the services provided to the Philadelphia unit were similar to those provided to the Bucks and Montgomery units, and the income from the Philadelphia contract permitted READS to increase its level of services by defraying overhead and administrative expenses on the other contracts.

23. Newnam's weekly base salary was increased at an annualized rate of $10,000, on January 1, 1977, as a result of READS' acceptance of the Philadelphia service contract.

24. READS' reported net profit on the three unit contracts for the fiscal year June 30, 1976—July 1, 1977, was $78,294. Its actual net profit was higher. *See* Finding 16, *supra.*

25. READS' net profit on the three unit contracts for the fiscal year June 30, 1977—July 1, 1978, was $79,077.

26. READS' net profit on the three unit contracts for the fiscal year June 30, 1978—July 1, 1979, was $94,960.

27. In each fiscal year, the final net profits fell short of projections. This was due to the losses incurred on the Philadelphia contracts, and to cost overruns in fulfilling the contracts which READS was prohibited by the contracts from passing through to the intermediate school units.

28. Cost overruns on the contracts were due to unanticipated increases in truck and trailer expenses; gasoline; electrical hookup; office supplies; and test materials.

29. Most of the cost overruns were in the area of trailer and equipment repairs and increased salaries. READS concedes that there were expenditures for test materials, most of which were supplied to READS by Stricker's other companies, totalling approximately $9,500, over the three-year period at issue here. Newnam has presented no credible evidence that there were any additional expenditures benefiting Stricker's companies beyond those conceded by READS.

30. Newnam was paid a bonus for the year 1976–1977 in the amount of $7,925.50, which she accepted under protest as partial payment on the amount she contended was due her.

31. Newnam was paid no bonuses for the years 1977–1978, or 1978–1979, notwithstanding the contractual agreement between the parties entitling her to such bonuses.

32. READS' billings for equipment and services were subject to audit by the school districts which it served, and READS' charges were in fact audited by the Philadelphia School District.

33. In preparation for this litigation, READS' profit and loss statements for the fiscal years at issue here were audited by Willard Amos, Certified Public Accountant, and were certified as being accurate after a review of READS' financial records.

## II. DISCUSSION

### A. *Breach of Contract*

READS contends that it should be relieved of liability for any bonuses allegedly due Newnam on the ground that she breached her contract by refusing to cooperate with management and by attempting to undermine READS in order to establish a competing company. I reject this contention for several reasons.

First, the evidence that Newnam breached her contract is not persuasive. It is clear that she had disagreements with management; that she requested more personnel and equipment than management was prepared to supply; that she advocated fairer treatment of READS employees by management; and that she believed that George Stricker was misusing the READS program for his own gain. There is no evidence, however, that she breached her employment agreement by failing to perform her duties or by attempting to compete with READS.

Second, the letter terminating Newnam's services did not contain any criticism of her, and did not suggest that she breached her contract. On the contrary, the letter instructed her to remain available for whatever assignments READS might have for her for the duration of the contract.

Finally, concurrently with the letter announcing her termination, George Stricker wrote to Newnam that READS intended to honor its commitment to pay her a bonus for the duration of the contract. Had Newnam been in breach of her contract at that time, as READS now contends, I cannot

believe that Stricker would have voluntarily agreed to honor the bonus provision. Accordingly, READS' defense that the contract has been voided because of Newnam's breach is rejected, and the only remaining question of substance is the amount of bonus to which Newnam is entitled under the terms of the contract.

### B. *Validity of the Cost Overruns*

Newnam contends that Stricker engaged in a systematic effort to reduce her bonus under the contract by artificially inflating expenses, thereby reducing the amount of net profit to READS and the amount of bonus due her. She alleges that Stricker did this (1) by increasing expenses for educational materials and equipment from his affiliated companies, and (2) by creating a paper loss to READS under the Philadelphia unit contracts while reaping a profit for his affiliated companies in supplying the materials and equipment used to service Philadelphia.

Initially, I note that there is a certain anomaly in Newnam's position. To the extent that the prices charged for materials and equipment from the Stricker companies were a part of the original unit contracts, any price inflation worked to Newnam's benefit, because institutional overhead, which was one of the critical factors in net profit, was based on a percentage of the total cost of the contract. Therefore, the higher the cost of the contract, the higher the institutional overhead, and hence the higher the bonus which Newnam could collect. The allegedly inflated prices charged by the Stricker companies only worked to Newnam's disadvantage to the extent that they resulted in budget overruns.

■ With respect to the Philadelphia contracts, I am satisfied that there is a difference between the service and equipment contracts, and that Newnam is not entitled to a bonus on the equipment contract. This contract was entered into at the request of the Philadelphia School District shortly after READS entered into the service contract with Philadelphia. Newnam was involved strictly in the service aspects of the READS program, and it appears clear from the record that although READS agreed to supply equipment to the Philadelphia unit, only Stricker's other companies had the resources or the experience to do so.

■ I am also persuaded that READS did not enter into the Philadelphia contracts for the purpose of creating a loss. It is undisputed that when READS first bid on the Philadelphia contract, it expected to earn a percentage above costs as institutional overhead. It was only after the proposal was returned by Philadelphia officials that READS eliminated institutional overhead from the budget. Therefore, it is plain that in entering into the Philadelphia contracts initially, Stricker intended to earn a profit for READS. I also accept Stricker's explanation that accepting the Philadelphia contract at a loss nonetheless benefited READS, by giving it a broader base over which to spread expenses. In this regard, I note that Newnam herself received a $10,000 increase in base salary as a result of the Philadelphia contract and, in light of this fact, she can scarcely be heard to complain that the Philadelphia contract worked solely to her detriment.

■ Although I have rejected the contention that the Philadelphia contracts were a subterfuge designed to reduce the amount of bonus due to Newnam, I credit her contention that she is entitled to credit for the amount of institutional overhead projected for the first year's Philadelphia contract. The record is clear that although Philadelphia school officials rejected a line item for institutional overhead, Stricker's accountant created an invoice from A/V for an equivalent amount which was in fact, albeit not on paper, a profit to READS. Accordingly, the loss of $19,812 claimed by READS on the 1976–1977 contract should be reduced by $15,572, and Newnam's bonus for that year correspondingly increased.

■ As to Newnam's contention that Stricker otherwise reduced READS' net profit by creating additional expenses in favor of his other companies, she has failed to establish by a preponderance of the evidence that Stricker in fact did so. Newnam

contends that *all* of the cost overruns were fictitious, and that her bonus should be calculated on the basis of the full net profits projected for each year, without regard to any of the cost overruns. Newnam introduced numerous documents at trial in an attempt to establish her theory, and although I am troubled by certain aspects of READS' operation and of George Stricker's method of conducting business, Newnam has failed to establish by a preponderance of the evidence that profits were diverted from READS to the other Stricker companies.

READS concedes that approximately $9,500 in cost overruns were for educational equipment and materials, most of which was apparently supplied by the Stricker affiliates A/V, Croft, and Walsh. But READS has also pointed to evidence in the record that the most substantial cost overruns were for truck repairs and maintenance, electrical hook-up, and salaries. I also note that there were substantial overruns in insurance costs. Newnam, on the other hand, has pointed to nothing in the record reflecting that a larger share of the cost overruns than that conceded by READS generated income for the Stricker companies. In light of the fact that the cost overruns on all three contracts over the three-year period in dispute ran well into six figures, I cannot say that the approximately $9,500 in cost overruns which might have redounded to the benefit of the Stricker companies constitutes an unreasonable amount reflecting a deliberate attempt to deprive Newnam of her bonus.[1]

### C. *Calculation of Newnam's Bonus*

In accordance with my finding that Newnam did not breach the employment contract, she is entitled to the contractual bonus for each of the three years in dispute.

READS concedes that Newnam is entitled to a bonus of $7,925 for fiscal year 1976–1977. I find that she is entitled to an additional $1,575 as her 10% share of the "disguised" institutional overhead of $15,-

752 on the first contract with the Philadelphia unit. *See* Finding 16. Newnam has already been paid $7,925 for 1976–1977, and therefore READS' total liability to Newnam for 1976–1977 is $1,575.

For the fiscal year 1977–1978, Newnam is entitled to a bonus of $7,907, representing 10% of READS' net profit of $79,077.

For the fiscal year 1978–1979, Newnam is entitled to a bonus of $9,496, representing 10% of READS' net profit of $94,960.

 The bonuses for fiscal years 1977–1978, 1978–1979 represent liquidated amounts because READS knew its profits for those years, and there could be no serious dispute that Newnam was entitled to a 10% bonus on those profits under the terms of the employment contract. Under Pennsylvania law, where the defendant commits a breach of contract to pay a definite sum of money, legal interest is allowed on the debt from the time performance was due. *Interlake, Inc. v. Erie Industrial Trucks, Inc.*, 427 F.Supp. 1012 (W.D.Pa.1977). Accordingly, Newnam is entitled to simple interest at the rate of 6% on the bonuses for 1977–1978 and 1978–1979.

Simple interest at 6% on $7,907 from July 1, 1978, the date the bonus was due, through July 31, 1981, is $1,462. Simple interest at 6% on $9,496 from July 1, 1979, through July 31, 1981, is $1,187.

### III. CONCLUSIONS OF LAW

1. This court has jurisdiction over this matter under 28 U.S.C. § 1332.

2. This action is governed by Pennsylvania law.

3. The written agreement of August 30, 1976, constitutes the entire agreement between the parties.

4. Plaintiff did not breach the contract between the parties.

5. Plaintiff is entitled to a bonus of 10% of the actual net profit realized by defendant in fiscal years 1976–1977, 1977–1978, 1978–1979.

---

1. I use the word "might" advisedly, because Newnam has not even established that all of the cost overruns for materials and equipment represent further business for the Stricker companies.

6. Plaintiff has established by a preponderance of the evidence that defendant improperly excluded from its stated net profit for 1976–1977, $15,752 in institutional overhead received from the Philadelphia contract.

7. Plaintiff has failed to establish by a preponderance of the evidence that defendant made use of its parent company and affiliated subsidiaries to inflate its costs and reduce the bonus to which plaintiff is entitled.

8. Defendant is liable to plaintiff for $18,978 in unpaid bonuses due plaintiff under the terms of the contract.

9. Plaintiff is entitled to legal interest on the unpaid bonuses, calculated from the date the bonuses were due.

10. Defendant is liable to plaintiff for $2,649 in interest on bonuses due but not paid.

11. Plaintiff is entitled to judgment against defendant in the total amount of $21,627.